CHARLES CARREON, ESQ. (127139)
2165 S. Avenida Planeta
Tucson, Arizona 85710
Tel: 520-841-0835
Fax: 520-843-2083
Email: chas@charlescarreon.com

Attorney for Plaintiff iCall, Inc.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

ICALL, INC.,

Plaintiff,

vs.

TRIBAIR, INC., ERIC REIHER, and Does 1 – 5,

Defendants.

AND RELATED COUNTERCLAIM

Case No.: CV 12 2406 EMC

**REPLY BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Judge: Hon. Edward M. Chen
Courtroom: 5, 17th Floor
Date: November 15, 2012_
Time: 9:30 a.m.

Plaintiff respectfully submits its reply brief in support of iCall, Inc.'s motion for preliminary injunction, including the memorandum of points and authorities submitted herewith, the Declarations of Arlo C. Gilbert and Charles Carreon and the exhibits attached thereto.

Dated: October 12, 2012

CHARLES CARREON, ESQ.

/s/Charles Carreon
Charles Carreon (CSB 127139)
Attorney for Plaintiff iCall, Inc.

**TABLE OF CONTENTS**


TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ iii

I. PLAINTIFF IS ENTITLED TO A PRELIMINARY INJUNCTION TO STOP TRIBAIR'S INFRINGING USE OF THE "iCall" MARK ........ 2

A. iCall Is Likely To Succeed on The Merits Because iCall's Trademark Rights Are Solidly Established, And Tribair's Defenses Are Legally Without Merit and Factually Unfounded 2

1. "It's Always Been Called WiCall" ........ 2

2. "Consumers Know It's Not iCall Because It's Not Free, It's Just Cheap" ........ 3

3. "Defendants Don't Market on the Internet" ........ 3

4. "iTunes and Google Android Market Aren't On The Internet" ........ 4

5. "Tribair's Use of the Wi-Fi Alliance Certification Mark Dispels Confusion" ........ 5

6. "Consumers Will Discover They Didn't Get iCall After They Download WiCall and Discover It Lacks Video Calling and Text Messaging" ........ 5

7. Reiher's Credibility Is Exploded and Cannot Recover ........ 6

8. Tribair Has No Real Investment In WiCall, That Is Just One Of the "Many Different Things In Parallel" That It Has Done To Garner Attention ........ 6

B. The Internet Troika Applies to This Case, And All Three Troika Factors Favor iCall ........ 8

1. Tribair's Contention That Precedent Has Limited Application of The Internet Troika Test To "Website Owners" Is Meritless ........ 8

2. All Three Internet Troika Factors Favor iCall ........ 9

C. None of the Five Remaining Sleekcraft Factors Weigh Strongly Against the Likelihood of Confusion ........ 9

1. iCall Is "The Cool *New York Times* App of the Week With The Ability to Turn Your iPod Touch and iPad Into A Phone," So the Mark Is Protectable ........ 10

2. Defendants Inferrably Intended to Infringe the iCall Mark ........ 11

3. Consumers Are Unlikely to Exercise Great Care in Selecting Between Two Free-or-Inexpensive Forms of VoIP ........ 11

4. There Is No Evidence of A Lack of Actual Confusion, So This Factor Cannot Weigh Strongly Against Issuing An Injunction ........ 12

D. California Trademark Law Authorizes the Issuance of Injunctive Relief to Remedy Infringements by "Colorable Imitations" of a Registered Mark ........ 12

E. Equity Restores The *Status Quo Ante*, Not The *Status Quo Post* ........ 12

F. The California Registration Does Not Depend Upon Any Assignment ........ 13

G. iCall Received All Goodwill From Its Predecessors In Interest, and Never Abandoned Its Mark ........ 13

**II. CONCLUSION........ 15**

# TABLE OF AUTHORITIES

## Cases

*Baker v. GMC*, 522 U.S. 222, 233 (1998)........................................................................ 10

*Boe v. Commissioner*, 307 F.2d 339, 342 (9th Cir. 1962) ........................................................ 12

*Bose Corp. v. QSC Audio Prods.*, 293 F.3d 1367, 1374 (Fed. Cir. 2002) .................................. 10

*Brookfield Comm'ns, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036 (9th Cir. 1999)..... 7

*Church of Scientology v. United States*, 506 U.S. 9, 12 (U.S. 1992).......................................... 12

*CRS Recovery, Inc. v. Laxton*, 600 F.3d 1138, 1142 (9th Cir. Cal. 2010).................................. 13

*Jones v. Peck*, 63 Cal. App. 397, 401-402 (Cal. App. 1923) ..................................................... 14

*Jupiter Hosting, Inc. v. Jupitermedia Corp.*, 76 U.S.P.Q.2d 1042 (N.D. Cal. 2004) ..................... 7

*Maxim Integrated Products, Inc. v. Quintana*, 654 F.Supp.2d 1024 (N.D.Cal. 2009).................. 8

*Maxim*, 654 F.Supp.2d at 1034. .................................................................................................. 9

*Maxim*, 654 F.Supp.2d at id. ....................................................................................................... 8

*Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555-556 (U.S. 1993)................... 12

*Official Airline Guides v. Goss*, 6 F.3d 1385, 1391 (9th Cir. Or. 1993)....................................... 9

*Perfumebay v. eBay*, 506 F.3d 1165, 1173. ................................................................................ 9

*Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165 (9th Cir. 2007) ............................................. 7

*Sanrio Co. v. J.I.K. Accessories*, 2012 U.S. Dist. LEXIS 55280 (N.D. Cal. April 9, 2012) .......... 1

*Seed Servs., Inc. v. Winsor Grain, Inc.*, 2012 U.S. Dist. LEXIS 51779 (E.D. Cal. Apr. 11, 2012) 1

*Tiddies, Inc. v. Brown*, 2005 LEXIS 3456 (N.D. Tex. Mar. 4, 2005)......................................... 14

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 18, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008).......................................................................................................................... 1

*Zobmondo Entertainment, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1009 (9th Cir. 2010)........ 10

## Statutes

Cal Bus & Prof Code § 14245 ................................................................................................. 11

Cal. Civil Code § 3528.............................................................................................................. 14

Cal. Corp. Code § 1903(b)......................................................................................................... 14

Civil Code § 3509 .................................................................................................................... 14

F.R.E 402 and 403 .......... 10
L.R. 7-3(a), .......... 10
Section 14250 .......... 11

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. PLAINTIFF IS ENTITLED TO A PRELIMINARY INJUNCTION TO STOP TRIBAIR'S INFRINGING USE OF THE "iCall" MARK

### A. iCall Is Likely To Succeed on The Merits Because iCall's Trademark Rights Are Solidly Established, And Tribair's Defenses Are Legally Without Merit and Factually Unfounded

The parties agree on the standard for adjudication this motion:

> "A plaintiff seeking a preliminary injunction must establish: (1) that he/she is likely to succeed on the merits, (2) that he/she is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his/her favor, and (4) that an injunction is in the public interest.
>
> *Seed Servs., Inc. v. Winsor Grain, Inc.*, 2012 U.S. Dist. LEXIS 51779 (E.D. Cal. Apr. 11, 2012), *citing Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 18, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008).

iCall is likely to succeed on the merits against Tribair, because iCall has unquestioned rights in the iCall mark that Tribair is infringing without the barest claim to legitimacy. The moving papers adequately established the strength of iCall's rights to the mark. Without engaging in hyperbole, it is fair to say that Tribair's opposition brief and the "factual" support provided by the Eric Reiher's declaration not only fail to rebut the moving party's contentions, but actually make clear that the defendants have engaged in intentional infringement of the iCall mark.

#### 1. "It's Always Been Called WiCall"

Tribair makes this unsworn assertion at page 3, line 24 of the Opposition: "Defendants have used WiCall as the name of its product since its inception." This might be helpful if it were true, but it is false. Reiher described Tribair's VoIP service to an interviewer in January 2011 without using the word "WiCall" once in the entire interview. At that time, the "product" was called "Tribair."

> "***Tribair is a smartphone application*** (iPhone, Android and Blackberry) ***that provides free calls*** between users worldwide, cheap calls to any other phone number, 45 percent cheaper than Skype, and a worldwide free Wi-Fi community where users can go to make calls we also build white label solutions for partners and communities with a revenue sharing model."
>
> (Exhibit 28, emphasis added.)

**2. "Consumers Know It's Not iCall Because It's Not Free, It's Just Cheap"**

Tribair contends that no consumer would confuse WiCall with iCall because "consumer[s] seeking a free service will quickly find that Defendants do not provide such a service." (Opp. 15:13-21; *see also,* Opp. 3:16-21 and12:1-15, citing Reiher Dec. ¶¶ 4 - 8.)

Tribair's contention is contradicted by Reiher's above-quoted admission that Tribair "provides ***free*** calls between users worldwide…." (Exhibit 28, emphasis added; *see also quote infra*.)

Tribair also tries to paint iCall as "free VoIP," while characterizing its own service as "cheap calling," but that is an entirely spurious distinction. iCall offers paid and free VoIP service, and competes aggressively on price. Indeed, it has a webpage entitled "Price" that tells users "how much you can save through iCall's flexible pricing" and offers international calling "anywhere, anytime, for less." (Supp. Gilbert Dec. ¶ 6; Exhibit 19.)

**3. "Defendants Don't Market on the Internet"**

The Tribair Opposition asserts in boldface: "Defendants Do Not Market on Traditional Internet Channels Because It Does Not Have A Website Or Use Website Advertising." (Opp. 12:16.)[1] Reiher told the Next Montreal interviewer a different story last January:

> "If you look at the Alexa ranking of ***our web site***, you can see a steady improvement. We started at the 21 million rank and in just a few months, have reached the 550,000 rank. The target is to reach 100,000 this year. We are always surprised by the rate at which our ranking is dropping. Just when we expect it to hit a plateau, our rank drops by another 50,000. *** Our users are doing most of the work as they must call another user for it to be ***free***. We monitor closely the ***free*** versus paying call ratio and the numbers are very good. ***Free*** calls are also nearly free for us, since they travel 100 percent of the way through the Internet. Overall, our cost of free is very low."
>
> (Exhibit 28, emphasis added.)

Tribair concedes that its VoIP service, referred to as "Tribair" in the Next Montreal interview, operates via the Internet through wireless "hot spots":

[1] Syntax error in original.

> "You can see Tribair as a cloud. Do you know where we are? Let me tell you a little bit about our open 'PoPs'. A PoP is a point of presence where we have VoIP servers. The closer the PoP is to you, the better chance we have to avoid Internet hazards (***packet loss,*** latency, jitter…) between you and us, and better the call quality will be. *** [T]he Internet is indeed a very complex INTER connection of NET work, and ***everywhere you have a net, you have 'hot spots'*** we call HUBs."
>
> (Exhibit 28, emphasis added.)

Tribair pays $99 per year to list WiCall in the App Store, and uses Google Play promotional services. (Supp. Gilbert Dec. ¶ 7; Exhibits 21 and 22.) As discussed in further detail below, both of these are Internet venues provide advertising access and promotional vehicles that Tribair utilizes to promote WiCall.

### 4. "iTunes and Google Android Market Aren't On The Internet"

Tribair markets WiCall service through its website, operates the service over the Internet, and supplies the necessary software through the iTunes / App Store and Google Play / Android Market. Nevertheless, Tribair somehow attempts to argue that, magically, when Tribair uses the Internet, it is not actually the Internet:

> "iTunes and Google's Android Market are the only avenues of 'advertising' that WiCall uses, and the formats of those databases lend themselves to clearing up confusion…."
>
> (Opp. 12:23-26.)

The App Store and Google Play are on the Internet as a matter of law. The statutory definition of the Internet for purposes of this motion appears at 15 U.S.C. §1127, the trademark definitional section, that incorporates by reference 47 U.S.C. §230(f)(1), that states:

> "The term 'Internet' means the international computer network of both Federal and non Federal interoperable packet switched data networks."

As iCall's CEO Arlo Gilbert explains, the App Store and Google Play are both merely a network of websites for App developers like Tribair and iCall, who exert control over their advertising and promotional content on web pages allocated to them by Apple and Google, respectively. (Supp. Gilbert Dec. ¶ 3.) Both the App Store and Google Play are accessible "through the international network of interoperable packet-switched data networks that comprise the Internet." (Supp. Gilbert Dec. at *id.*) Both the App Store and Google Play are served via the

Internet and World Wide Web, utilizing XML and HTML webpages designed to simplify navigation for mobile devices, and can be viewed on desktops, laptops, and mobile devices using standard Internet browsers such as Internet Explorer, Google Chrome, Mozilla Firefox, and Apple Safari. (Supp. Gilbert Dec. at *id.*)

**5. "Tribair's Use of the Wi-Fi Alliance Certification Mark Dispels Confusion"**

By this argument, Tribair attempts to argue that two trademark wrongs create one trademark right. Tribair has no right to use the Wi-Fi Alliance Certification Mark. (Supp. Carreon Dec. ¶ 4; Exhibits 24 and 25.) Counsel for iCall has confirmed this fact in a telephone conversation and email exchange with Katherine Keating, the attorney who registered the mark for the Wi-Fi Alliance. (Supp. Carreon Dec. ¶ 4; Exhibits 24 and 25.) Indeed, Ms. Keating confirmed that Tribair is well aware that it has no right to use the Wi-Fi Alliance Certification mark, which is why Tribair is no longer using it in the Apple App Store as it once did. (Supp. Carreon Dec. ¶ 6.b and ¶ 6.c; *also compare* Exhibits 26 and 27.) Further, Tribair's continued use of the Wi-Fi Alliance Certification Mark in other venues, such as on Google Play, is an act of infringement that cannot long continue. (Supp. Carreon Dec. ¶ 6.c; Exhibit 12 submitted with original moving papers.)[2]

**6. "Consumers Will Discover They Didn't Get iCall After They Download WiCall and Discover It Lacks Video Calling and Text Messaging"**

Tribair contends that actual confusion resulting from a consumer's choice of WiCall when they were actually looking for iCall would be dispelled once they discover that they can't get the text messaging and video calling they expected, because WiCall doesn't offer it. (Opp. 3:18-19; Reiher Dec. ¶ 6.) This is no defense, but rather an admission that, once hooked by initial interest confusion, a user who downloads WiCall instead of iCall is likely to be disappointed with what they thought was the iCall product, thus injuring their association with

---

[2] Like the other specious distinctions that Tribair attempts to draw, the notion that WiCall is uniquely a "wireless" VoIP App is a red herring. iCall VoIP operates over wireless connections, including public and private "hotspots." (Supp. Gilbert Dec. ¶ 10.)

the iCall mark. *See, Maxim Integrated Products, Inc. v. Quintana*, 654 F.Supp.2d 1024, 1036 (N.D.Cal. 2009) ("negative product review" was evidence that plaintiff had "already lost some control over its business reputation and goodwill").

**7. Reiher's Credibility Is Exploded and Cannot Recover**

Reiher claims that he had no intention to infringe the iCall mark by incorporating it into the WiCall mark. (Reiher Dec. ¶ 3.) However, given his long experience in the high-tech field, and the numerous prior inconsistent statements quoted herein, his veracity is greatly in doubt.

Reiher clearly has knowledge of the trademark registration process, having submitted Tribair's USPTO application Serial Number 8,5574,570, immediately after he received notice that iCall was protesting Tribair's use of WiCall in the Apple app Store. (Carreon Dec. ¶ 5.) Reiher falsely asserted in his declaration filed with the USPTO that he had no knowledge of any competing claimants to the mark. (Carreon Dec. ¶ 5.) Although Reiher denies it, he inferrably knew of iCall's registered mark, and deliberately infringed it, as one of the "many different things in parallel," that he has been using to help Tribair's "numbers quickly [grow] faster than expected." (Next Montreal interview, Exhibit 28.)

Reiher also knows that he has no right to incorporate the Wi-Fi Alliance Certification Mark into the "WiCall logo," but he keeps on doing it. Although Tribair no longer infringes the Wi-Fi Alliance Certification Mark in the Apple app store, that is solely because the Wi-Fi Alliance has taken action in that forum to end the infringement. Tribair continues to infringe the Wi-Fi Alliance Certification Mark in Google Play and at other locations on the Internet, in its advertising.

**8. Tribair Has No Real Investment In WiCall, That Is Just One Of the "Many Different Things In Parallel" That It Has Done To Garner Attention**

Tribair has developed no rights to the WiCall name based upon use.[3] It has shown no loyalty to the WiCall brand, and has proliferated a plethora of marks to hedge its bets. Tribair's

---

[3] Significantly, with regard to Tribair's purported rights in the WiCall name, Reiher contends that WiCall is *descriptive*. (Reiher Dec. ¶ 3.) The descriptive nature of the WiCall mark being

*modus operandi* is to engage in unscrupulous promotion, by all means possible, using other people's marks wherever convenient. This is what Reiher means when he talks about pursuing different avenues "in parallel."

The progress of Tribair's VoIP marketing has resulted in ***six phases of marketing***, and ***five distinguishable brands***:

a. Tribair launched its VoIP under the Tribair brand. (Supp. Carreon Dec. ¶ 6.a; Exhibit 13.)

b. Jealous of iCall's popularity, Tribair incorporated the iCall mark into its WiCall mark, and for visual flair, joined it with the Wi-Fi Alliance Certification Mark # 2,523,241, despite not having any Wi-Fi certified equipment to sell. (Exhibit 26.) This agglomeration of "other-people's marks" appeared in the iTunes / App Store until the Wi-Fi Alliance learned of the infringement. (Supp. Carreon Dec. ¶ 6.c; Reiher Dec. ¶ 19 and Exhibit 11.)

c. After being notified by the Wi-Fi Alliance that it did not have the right to use the Wi-Fi Alliance Certification Mark, Tribair altered the visual component of its logo in the iTunes / App Store, creating yet *another mark*. (*See* Reiher Dec. ¶ 19 and iCall's Exhibit 11.) Additionally, Tribair designated "iCall" as a search keyword in the App Store, so that consumers looking for iCall would discover WiCall, thus leading to increased brand confusion. (Supp. Carreon Dec. ¶ 6.c.)

d. Tribair attempted to register the text-only WiCall mark with the USPTO, Serial Number 8,5574,570. *See* iCall's Letter of Protest, Exhibit 14. (Supp. Carreon Dec. ¶ 6.d.)

e. Tribair continues to market the WiCall app on Google Play combining the WiCall mark and the Wi-Fi Alliance Certification Mark, in defiance of the Wi-Fi Alliance's trademark rights and enforcement efforts. (Supp. Carreon Dec. ¶¶ 4 and 6.e; Exhibits 25 and 27.)

f. Tribair continues to market under the name of Tribair in the App Store, on Google Play, and at its Tribair.com website, using a third logo that incorporates a "T" and a telephone handset in profile. (Exhibit 13.) Further, ***when an Internet user searches for "iCall"*** in the search box ***on Google Play***, as it once did in the App Store with respect to WiCall, ***the Tribair app appears***. (Exhibit 28.)

By this type of multi-pronged, parasitic marketing activity, Tribair has accrued no rights in any mark except, perhaps, in "Tribair."

---

admitted, Tribair can assert no rights in it sufficient to overcome iCall's established rights in its iCall mark.

### B. The Internet Troika Applies to This Case, And All Three Troika Factors Favor iCall

#### 1. Tribair's Contention That Precedent Has Limited Application of The Internet Troika Test To "Website Owners" Is Meritless

Understandably anxious about taking its turn on the Internet Troika, Tribair distorts the law by arguing that its application has been constricted by precedent:

> "The application of the Internet troika has been limited to cases where a defendant owns a website. *For e.g. Brookfield Comm'ns, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036 (9th Cir. 1999); *GoTo.com Inc. v. The Walt Disney Company*, 202 F.3d 1199 (9th Cir. 2000); *Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165 (9th Cir. 2007); *Jupiter Hosting, Inc. v. Jupitermedia Corp.*, 76 U.S.P.Q.2d 1042 (N.D. Cal. 2004)."
>
> (Opp. 6:3-10.)

Given this statement, one would expect some support for the contention in the cited cases – perhaps even some reference to "limiting language" in the holdings; however, there is none. In *Brookfield, supra*, ***the word "website" appears only once*** in a quote from the plaintiff's papers.[4] In *GoTo.com, supra*, ***the word "website" does not appear at all***. *Perfume Bay, supra*, uses the word website once, without any hint that the opinion "limits" the application the Internet Troika to "website owners."[5] Finally, in *Jupiter, supra*, there are four incidences of the word "website," three in the statement of facts and one in the analysis, without any allusion to the concept of "limiting" the application of the Internet Troika. *Jupiter, 2004 U.S. Dist. LEXIS 28669* at pages 1 and 2. Fundamentally, all of this distortion of precedent serves no purpose, since Tribair does own a website at Tribair.com, and it advertises WiCall on its mini-websites at the App Store and Google Play.[6]

---

[4] "Soon thereafter, Brookfield applied ex parte for a temporary restraining order ("TRO") enjoining West Coast 'from using . . . in any manner . . . the mark MOVIEBUFF . . . as the name of West Coast's website service….'" *Brookfield*, 174 F.3d 1036, 1037 (9th Cir. 1999).

[5] "Although they may differ slightly in that eBay offers the additional auction component of its website, 'even services that are not identical are capable of confusing the public.'" *Perfumebay.com Inc. v. eBay Inc.*, 506 F.3d 1165, 1174 (9th Cir. Cal. 2007)

[6] The URLs for the WiCall mini-websites are, respectively:
App Store: https://itunes.apple.com/us/app/wicall-cheap-voip-phone-call/id489885695?mt=8
Google Play: https://play.google.com/store/apps/details?id=com.wicall&hl=en

**2. All Three Internet Troika Factors Favor iCall**

The three Troika factors were adequately covered in the moving papers; however, to briefly revisit, they are: (1) defendant's use of a mark similar to plaintiff's, (2) to market related goods and services, (3) on the Internet.

There can be little question that WiCall is similar to iCall. Presented with the question: "Are these two marks similar?" any reasonable finder of fact will answer "Yes." As Judge Ware held in *Maxim Integrated Products, Inc. v. Quintana*, 654 F.Supp.2d 1024 (N.D.Cal. 2009), similarity is readily established when the junior mark incorporates the senior mark "in its entirety." *Maxim*, 654 F.Supp.2d at 1033.

Nor can there much argument about whether one VoIP service is "related" to another. Both iCall VoIP and Tribair's service do the same thing: they allow consumers to play voice calls over the Internet at a lower cost that standard landline or wireless calls. In *Maxim* two products were found to be similar even though the two products didn't even do the same thing.[7]

Finally, there is no question that both iCall and WiCall are marketed on the Internet.

Accordingly, the three Internet Troika factors favor iCall, and the only question remaining is whether "the other factors … weigh strongly against a likelihood of confusion to avoid the finding of infringement." *Perfumebay v. eBay*, 506 F.3d 1165, 1173.

**C. <u>None of the Five Remaining Sleekcraft Factors Weigh Strongly Against the Likelihood of Confusion</u>**

Of the five remaining Sleekcraft factors, only four are applicable here:[8] (1) iCall's strength as the senior mark, (2) defendants's intent to deceive, (3) the degree of care consumers exercise of care in choosing among low-cost and free VoIP services, and (4) actual confusion.

---

[7] Plaintiff's product was a "computer chip enclosed in a 16mm-thick stainless steel can," and defendant's product was "a portable MP4 promotional device that … displays videos or pictures…." *Maxim*, 654 F.Supp.2d at id.

[8] Because the two competing VoIP services are nearly identical, and competing in a single market, the "likelihood of expansion into other markets factor" is not relevant. Eg., Judge Ware gave it no weight in his analysis of "iButton" versus "My-iButton." *Maxim*, 654 F.Supp.2d at 1034. Accordingly, it cannot "strongly weigh against" issuance of an injunction.

As the argument below establishes, there is no evidence in the record to diminish the finding of a likelihood of confusion established by the application of the Internet Troika factors.

### 1. iCall Is "The Cool *New York Times* App of the Week With The Ability to Turn Your iPod Touch and iPad Into A Phone," So the Mark Is Protectable

A protectable mark identifies a good or service and indicates its origin, answering these questions: "'Who are you?' 'Where do you come from?' 'Who vouches for you?'" *Official Airline Guides v. Goss*, 6 F.3d 1385, 1391 (9th Cir. Or. 1993), *quoting* 1 J. McCarthy, Trademarks and Unfair Competition, § 12.01 (3d ed. 1992). When subjected to the "Who are you?" test, the answer is clear. "iCall" is:

> "[The] cool *New York Times App of the Week* [with the] ability to turn your iPod Touch and iPad into a phone, as well as instant message users on a variety of IM platforms including iCall, AIM, Facebook, Windows Live Messenger, ICQ and Google Talk."
>
> (Exhibit 30, "The 5 newest VoIP Apps on the Market," 11/1/2012.)

Such media recognition provides evidence that the iCall mark (1) identifies iCall VoIP and plaintiff as its source of origin, and (2) vouches for the quality of the service with a cite to the *New York Times*, nation's "newspaper of record."

Press publicity[9] is good evidence of the strength of the iCall mark.

> "Although ***the books*** were not the subject of a paid advertising campaign at the time of their publication, they ***received unpaid print, radio, and television publicity***, ***including mention in magazines*** such as *Rolling Stone* and comment on television shows such as *Oprah* and *The Tonight Show with Jay Leno."*
>
> *Zobmondo Entertainment, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1009 (9th Cir. 2010) (emphasis added).

Media recognition is reliable evidence of mark strength.

> "[D]irect evidence of consumer awareness of products and the marks they bear is preferable to indirect evidence of consumer recognition…."

---

[9] The New York Times recognized iCall as App of the Week over two years ago. http://www.nytimes.com/2010/02/04/technology/personaltech/04app.html This media recognition has grown as the New York Times articles is cited in numerous other publications. (Exhibit 31; Google search results for "iCall+new+york+times+app+of+the+week.")

> *Bose Corp. v. QSC Audio Prods.*, 293 F.3d 1367, 1374 (Fed. Cir. 2002) (citing media recognition as "direct evidence of consumer awareness").

The iCall mark is solid, and Tribair's attempt to argue that the mark is in wide use by others in the VoIP field falls flat for lack of evidence.[10] Nor does the invocation of findings in an unrelated matter involving unrelated parties and extraneous facts.[11] Accordingly the "strength of the mark" factor does not weigh strongly against a finding of likelihood of confusion.

**2. Defendants Inferrably Intended to Infringe the iCall Mark**

As set forth in some detail at section I.A. *supra*, Reiher and Tribair have pursued six different marketing strategies as "parallel" activity in an effort to grow Tribair's customer base. Reiher's denial of intent to infringe is at variance with his knowledge of trademark procedure. Further, under his direction, Tribair is infringing not only the iCall mark, but also the Wi-Fi Alliance Certification Mark. The only explanation for the multiple misstatements of fact in the Opposition and Reiher's declaration is that the defendants intend to deceive this Court about their intention to deceive consumers. Thus, although evidence of intent to infringe was lacking when iCall filed its moving papers, Tribair's opposition has cured the lack, and this factor now inclines in iCall's favor.

**3. Consumers Are Unlikely to Exercise Great Care in Selecting Between Two Free-or-Inexpensive Forms of VoIP**

The case precedent on this factor is not in dispute, and the facts need not be argued at great length. Tribair's only argument on this factor is the idea that WiCall isn't marketed on the Internet, a notion that has been thoroughly rebutted *supra*. Accordingly, this factor weighs in iCall's favor and certainly does not weigh strongly against issuing an injunction.

---

[10] Of all of the products and services Reiher identifies in paragraph 18 of his declaration, counsel for iCall discovered that only one is actually a telephone calling service, and that company will be on the receiving end of enforcement action promptly. (Carreon Dec. ¶ 5.)

[11] Tribair attempts, improperly and without relevance, to invoke the spectre of a dead case that was settled without going to judgment and has no claim-preclusive effect, *i.e.*, the Reliance lawsuit. *See*, *Baker v. GMC*, 522 U.S. 222, 233 (1998) (defining issue-preclusion). Accordingly, Plaintiff objects to the relevance and admissibility of Exhibit G to the Declaration of John Kirke. F.R.E 402 and 403. Pursuant to L.R. 7-3(a), this evidentiary objection is made within the brief.

**4. There Is No Evidence of A *Lack* of Actual Confusion, So This Factor Cannot Weigh Strongly Against Issuing An Injunction**

Neither party has presented any probative evidence on this topic. Accordingly, it remains in equipoise, and cannot weigh against issuing an injunction.

**D. <u>California Trademark Law Authorizes the Issuance of Injunctive Relief to Remedy Infringements by "Colorable Imitations" of a Registered Mark</u>**

Tribair's contention that California trademark only authorizes the issuance of injunctions to cure trademark counterfeiting is mistaken. The remedies of a registered owner against an infringer of a registered mark are set forth in Cal Bus & Prof Code § 14245, quoted in relevant part as follows, incorporating the remedies set forth in Section 14250:

> "(a) A person who does any of the following shall be subject to a civil action by the owner of the registered mark, and the remedies provided in Section 14250:
> (1) Uses, without the consent of the registrant, any reproduction, counterfeit, copy, or colorable imitation of a mark registered under this chapter in connection with the sale, distribution, offering for sale, or advertising of goods or services on or in connection with which the use is likely to cause confusion or mistake, or to deceive as to the source of origin of the goods or services."

Section 14250, in turn, provides in relevant part as follows:

> "(a) Any owner of a mark registered under this chapter may proceed by suit to enjoin the manufacture, use, display, or sale of any counterfeits thereof and any court of competent jurisdiction may grant injunctions to restrain the manufacture, use, display, or sale as may be deemed just and reasonable, and shall require the defendants to pay to the owner up to three times their profits from, and up to three times all damages suffered by reason of, the wrongful manufacture, use, display, or sale."

Accordingly, California law authorizes issuance of the injunction requested by iCall to restrain Tribair from using or displaying any mark infringing the iCall registered mark.

**E. <u>Equity Restores The *Status Quo Ante*, Not The *Status Quo Post*</u>**

Although the courts cannot erase the past, equity attempts to restore the parties to the *status quo ante*. *Church of Scientology v. United States*, 506 U.S. 9, 12 (U.S. 1992) (where court cannot restore *status quo ante,* a partial remedy may be adopted). Tribair's argument that its infringing activity has become the *status quo* would turn equity on its head. Where the failure to restrain infringement would perpetuate the likelihood of confusion and risk irreparable injury to

the senior markholder, it would be madness to preserve the *status quo* ***post***. Plaintiff has carried its burden of showing a likelihood of prevailing on the merits, the balance of the hardships tipping in its favor, and the public interest in honest commerce hanging in the balance. The Court should do equity, and restore the *status quo ante*.

**F. The California Registration Does Not Depend Upon Any Assignment**

This motion is grounded on the authority of the California registered mark, and stands solidly on iCall's independent use in commerce of the iCall mark for eight years since its acquisition in 2004. Indeed, since receiving the assignment of the Federal registration, "Plaintiff has greatly increased the brand recognition for the iCall Mark … lead the entry of VoIP Apps into the App Store … and business has grown to the point where Plaintiff's private network carries over 1 Billion minutes of global voice traffic per month." (Gilbert Dec. ¶ 17.)

**G. iCall Received All Goodwill From Its Predecessors In Interest, and Never Abandoned Its Mark**

> "Although the definition of goodwill has taken different forms over the years, the shorthand description of goodwill as ***'the expectancy of continued patronage,'*** provides a useful label with which to identify the total of all the imponderable qualities that attract customers to the business."
>
> *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555-556 (U.S. 1993), *quoting Boe v. Commissioner*, 307 F.2d 339, 342 (9th Cir. 1962) (emphasis added).

When iCall purchased the ICALL.COM domain, it acquired the goodwill as a property right appurtenant to the primary item of intellectual property and operational infrastructure for the iCall VoIP operation. As CEO Arlo Gilbert stated in his first declaration in support of the motion:

> "The iCall.Com domain was a core piece of intellectual property at the heart of the VoIP enterprise operated by Plaintiff's predecessors-in-interest, who registered the domain on November 26, 1996, and used it to offer VoIP service until it was transferred to me on July 24, 2004. Thus, Plaintiff's predecessors-in-interest identified the brand with VoIP services. By acquiring the iCall.Com domain and the iCall Mark, ***I acquired both the name and its potential for future exploitation, and the existing stream of Internet customers that had built an association with the iCall Mark and the website***. Thus, the iCall.Com domain embodied the VoIP-related goodwill that had been garnered."
>
> (Gilbert Dec. ¶ 16, emphasis added.)

The ICALL.COM domain name is the cornerstone of the goodwill of iCall's business, much as a piece of real estate with a good location is the cornerstone of the "brick and mortar" economic model. It is more than a word, it is a destination for future customers, the very essence of an "expectancy of continued patronage."

Tribair contends "there was no transfer of the underlying business assets,"[12] but the ICALL.COM domain is an essential infrastructure asset for which iCall paid substantial consideration. (Gilbert Dec. ¶ 16.)

> "Like the majority of states to have addressed the issue, California law recognizes a property interest in domain names. As we explained in *Kremen v. Cohen*, ***domain names are intangible property*** subject to conversion claims. 337 F.3d 1024, 1030 (9th Cir. 2003). To this end, "courts generally hold that domain names are subject to the same laws as other types of intangible property."
>
> *CRS Recovery, Inc. v. Laxton*, 600 F.3d 1138, 1142 (9th Cir. Cal. 2010) (emphasis added).

Thus, iCall did not buy a naked trademark when it acquired the Federal registration from its predecessors in interest – it acquired personal property, "digital real estate," and the appurtenant goodwill that went with it. The actual goodwill, the expectancy of future patronage, went with the domain name, and any omission of the term "goodwill" from a document is as insignificant. An applicable maxim of jurisprudence states: "The law respects form less than substance." Cal. Civil Code § 3528.[13]

Finally, after iCall took the paper assignment, it received a *nunc pro tunc* assignment of all goodwill to cure any clerical deficiencies and registered it with the USPTO. (Supp. Carreon Dec. ¶ 8; Exhibit 29.) The *nunc pro tunc* assignment was validly issued by John Mackel, the corporate officer charged with winding up the affairs of the predecessor entities that owned the Federal registration and the ICALL.COM domain. (Supp. Carreon Dec. ¶ 8.) Under Cal. Corp. Code § 1903(b) and California law of corporate dissolution, such a transfer by an authorized

---

[12] It is puzzling that Tribair contends the mark was abandoned. Under 15 U.S.C. § 1127, a mark is abandoned when its "use has been discontinued with intent not to resume such use." Tribair has submitted no evidence of abandonment.

[13] "The maxims of jurisprudence hereinafter set forth are intended not to qualify any of the foregoing provisions of this code, but to aid in their just application." Civil Code § 3509.

corporate agent is valid as the trustee of the corporate assets.[14] A *nunc pro tunc assignment* of goodwill is valid back to its effective date. *Eg.*, *Tiddies, Inc. v. Brown*, 2005 LEXIS 3456 (N.D. Tex. Mar. 4, 2005). Accordingly, even though not at all essential to the issues before the Court, the assignment of the Federal registration is valid, because the goodwill of iCall's predecessor-in-interest was transferred, both in reality, and on paper.

## II. CONCLUSION

iCall is likely to prevail on the merits of its claim against Tribair for infringement of California Service Mark 66916, that secures its exclusive right to use the "iCall" mark in the State of California in the offering of Telecommunications Services, Carrier Services, and Mobile Platforms. iCall is likely to suffer irreparable harm in the absence of preliminary relief. The balance of equities tips in favor of iCall. An injunction is in the public interest. Accordingly, the Court is requested to issue an injunction in the form previously submitted.

Dated: October 12, 2012

CHARLES CARREON, ESQ.

/s/Charles Carreon
Charles Carreon (CSB 127139)
Attorney for Plaintiff iCall, Inc.

[14] "When a voluntary proceeding for winding up has commenced, the board shall continue to act as a board and shall have full powers to wind up and settle its affairs, both before and after the filing of the certificate of dissolution." Cal. Corp. Code § 1903(b). "All of the property of a defunct corporation belongs to the persons who were its stockholders at the time it ceased to be a corporation, but the right of possession passes to the directors in office by force of the statutory provision which makes them trustees to settle the corporate affairs." *Jones v. Peck*, 63 Cal. App. 397, 401-402 (Cal. App. 1923).