United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ICALL, INC.,                                          No. C-12-2406 EMC

            Plaintiff,

    v.                                               **ORDER DENYING PLAINTIFF'S
                                                     MOTION FOR PRELIMINARY
TRIBAIR, INC., *et al.*,                             INJUNCTION**

            Defendants.                              **(Docket No. 28)**
_____/

AND RELATED COUNTERCLAIM

_____/


        Plaintiff iCall, Inc. has filed suit against Defendants Tribair, Inc. and its CEO, Eric Reiher,

asserting claims for, *inter alia*, trademark infringement and unfair competition in violation of federal

and state law.[1]   Currently pending before the Court is iCall's motion for a preliminary injunction.  In

_____

    [1]  A complete list of the claims is as follows:

        1.    Infringement of a registered trademark in violation of the Lanham Act, 15
              U.S.C. § 1114.
        2.    Use of a false designation in violation of the Lanham Act, 15 U.S.C. §
              1125(a).
        3.    Dilution of a famous mark in violation of the Lanham Act, 15 U.S.C. §
              1126(c).
        4.    Use of a colorable imitation or counterfeit of a registered mark in violation of
              California Business & Professions Code § 14245(a) *et seq.*
        5.    Unfair competition in violation of California Business & Professions Code §
              17200.
        6.    Declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

United States District Court

For the Northern District of California

1    the motion, iCall basically seeks to prevent Defendants from using the "WiCall" mark, which iCall

2    contends infringes on its registered "iCall" mark.

3    **I.    FACTUAL & PROCEDURAL BACKGROUND**

4          The evidence submitted by the parties in conjunction with the pending motion reflects as

5    follows.  Where there are disputes of fact, they are so noted.

6          iCall is a company that has as its primary product and service a "Voice-Over Internet

7    Protocol ('VOI') calling platform that operates on desktop computers, on the Apple iPhone, iPad,

8    and iPod, [and] on Android mobile devices and smartphones."  Gilbert Decl. ¶ 2.  iCall has both free

9    and paid versions of its service.  *See* Gilbert Decl. ¶ 4.  iCall has had an application available on

10   Apple's App Store since 2009.  *See* Gilbert Decl. ¶ 5.

11         iCall has both a federal and a state registration for its mark "iCall."  *See* Gilbert Decl. ¶¶ 12-

12   13.  The federal registration indicates that the mark was first used in commerce in 1997.  *See* Gilbert

13   Decl. ¶ 13; *see also* FAC, Ex. 1 (federal registration).  The state registration indicates that the mark

14   was first used in California in 1999.  *See* Gilbert Decl. ¶ 12; *see also* FAC, Ex. 3 (state registration).

15         In 2012, Tribair made available its own VoIP product and service using the mark "WiCall."[2]

16   *See* Reiher Decl. ¶4.  According to Defendants, "Tribair selected the name WiCall because it was a

17   simple name that described what the application does: Wi-Fi calls."  Reiher Decl. ¶ 3.

18         Tribair maintains that it does not offer any free versions of its product or service.  Although

19   "[n]ew customers are given a nominal amount in free credits (less than $1) so that they may try the

20   service at no cost[,] [o]nce these credits have been depleted, a customer must purchase credits to

21   continue to make calls."  Reiher Decl. ¶ 8.  iCall argues that the above indicates that Tribair does in

22   fact offer free service.  *See* Supp. Gilbert Decl. ¶ 6.c.  iCall further argues that Tribair offers free

23   services (in addition to paid services) based on public statements that Mr. Reiher made in or about

24   January 2011.  *See* Reply at 2-3; Supp. Carreon Decl., Ex. 28 (interview with Mr. Reiher).

25

26

27         [2]  iCall claims that "Tribair launched its VoIP under the Tribair brand," instead of the WiCall
     brand.  Supp. Carreon Decl. ¶ 6.a; *see also* Reply at 2.  Tribair maintains that the Tribair product and
28   WiCall product are different.

2

**United States District Court**

For the Northern District of California

1    Defendants assert that those statements were applicable to their Tribair product which is different

2    from their WiCall product (which did not yet exist at the time).

3        Defendants claim that they have successfully promoted WiCall without doing any

4    advertising.  *See* Reiher Decl. ¶ 11.  For example, "WiCall does not have a website, and Tribair does

5    not pay for advertising on Apple's iTunes App Store or Google's Android Market."  Reiher Decl. ¶

6    11.  iCall disputes this claim by Defendants, asserting, for instance, that Tribair still has its own

7    website through which it markets WiCall.  *See* Reply at 4.  iCall also suggests that WiCall is

8    advertised on the Internet because the App Store and Android Market are available on the Internet.

9    *See* Reply at 4.  Finally, iCall maintains that Tribair does in fact pay for advertising on the App Store

10   it must pay $99 per year to list WiCall in the App Store.  *See* Supp. Gilbert Decl. ¶ 7.a & Ex. 20

11   (iOS Developer Program).  As for the Android Market, iCall asserts that, "[i]n order to achieve the

12   type of 'momentum' in marketing Apps that [Defendants] boast[], it is necessary to utilize

13   techniques such as are discussed in the blog post entitled 'Android App marketing and Google Play -

14   - What you need to know (a preview).'"  Supp. Gilbert Decl. ¶ 7.b & Ex. 22 (blog post).  The blog

15   post notes, *inter alia*, that "Google Play's ranking algorithm rewards long-term user acquisition.

16   Apps that retain users are rewarded with higher ranks.  Therefore, *advertising campaigns* should be

17   run over a longer term and sustained over several months, as opposed to the short bursts or activity."

18   Supp. Gilbert Decl., Ex. 22 (blog post) (emphasis added).  The blog post also states:

19           To build a thriving app business, you need installs by loyal users.  It is
             loyal users who use your app repeatedly, make purchases, register, or
20           take other actions that tie back to an ROI.  However, studies show that
             many users who install an app never even use it, or abandon it after a
21           single use.  Try to optimize your *advertising efforts* on traffic sources
             that are delivering your loyal users.
22

23   Supp. Gilbert Decl., Ex. 22 (blog post) (emphasis added).

24       iCall claims that it has suffered injury as a result of Defendants' use of the "WiCall" mark

25   because, after spending more than $4 million "to acquire the iCall.com and the iCall mark, to submit

26   a patent application, develop and deploy the iCall software, develop and promote the iCall.com

27   website, and push to the forefront of the VoIP mobile market," it is "in danger of losing control over

28

1   its own business reputation and the good will that have accrued to the iCall mark over the years."

2   Gilbert Decl. ¶ 20.

3          In turn, Defendants claim that Tribair would suffer great injury should an injunction issue

4   barring it from using the "WiCall" mark.  Defendants explain that there are more than 1,000 VoIP

5   applications available (including, *e.g.*, Skype).  *See* Reiher ¶ 9.  Thus,

6               [p]lacement on the search results of the iTunes App Store and Android
               Market is critical to an application's success.  Being at the top of the
7               list when a user queries keywords like "VoIP" is an extremely
               valuable commodity.  The highest results has a much higher chance of
8               being downloaded than a result five, ten or fifty slots further down.

9   Gilbert ¶ 15.  Currently, "if a user searches for 'VoIP Calls' in the iTunes App Store, WiCall

10  populates as the fifth result."  Reiher Decl. ¶ 16.  "On the Android Market, WiCall populates as the

11  second result."  Reiher Decl. ¶ 16.  According to Defendants,

12              [n]o one really knows exactly what would happen to the ordering of
               results if WiCall was renamed, because Apple and Google use a secret
13              method to order search results on their iTunes App Store and Android
               Market.  A renamed product might be dropped all the way down to the
14              bottom of keyword search results, even if all of its other features
               remain the same.
15

16  Reiher Decl. ¶ 15.  Defendants add that "[r]eturning to the WiCall name after litigation concludes

17  would not restore WiCall's strong position on the search results, and WiCall would never fully

18  recover regardless of the amount of time, effort and expense Tribair invested."  Reiher Decl. ¶ 16.

19                              **II.  DISCUSSION**

20  A.      Legal Standard

21          "'A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

22  the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

23  balance of equities tips in his favor, and that an injunction is in the public interest.'"  *Network*

24  *Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 11, 1144 (9th Cir. 2011) (quoting *Winter v.*

25  *Natural Res. Defense Council, Inc.*, 555 U.S. 7 (2008)).  The Ninth Circuit has held that

26              the "serious questions" approach survives *Winter* when applied as part
               of the four-element *Winter* test.  In other words, "serious questions
27              going to the merits" and a hardship balance that tips sharply toward
               the plaintiff can support issuance of an injunction, assuming the other
28              two elements of the *Winter* test are also met.

4

United States District Court

For the Northern District of California

1   *Alliance For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

2          As to the other two elements of the *Winter* test, the element of irreparable harm is

3   particularly important.  As made clear by Supreme Court case law, the mere possibility of

4   irreparable harm is not sufficient; irreparable harm must be likely.  *See Winter*, 555 U.S. at 22

5   (stating that "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is

6   inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only

7   be awarded upon a clear showing that the plaintiff is entitled to such relief").

8          Moreover, although neither the Supreme Court nor the Ninth Circuit has made an express

9   holding on this point, irreparable harm in a trademark case should not be *presumed* simply because

10  the mark holder has established a likelihood of success on the merits.  The Supreme Court has

11  rejected such a presumption in the patent context, *see eBay inc. v. MercExchange, L.L.C.*, 547 U.S.

12  388 (2006), and the Ninth Circuit has extended that holding in *eBay* to the copyright context.  *See*

13  *Flexible Lifeline Sys. v. Precision Lift, Inc.*, 654 F.3d 989, 995-96 (9th Cir. 2011) (explaining that

14  *eBay* cannot be narrowly read to apply in the patent context only).  There does not seem to be any

15  reason why that presumption should still apply in the trademark context.  *See, e.g.*, *BomerangeIt,*

16  *Inc. v. ID Armor, Inc.*, No. 5:12-CV-0920 EJD, 2012 U.S. Dist. LEXIS 86382, at *9 (N.D. Cal. June

17  21, 2012) (in a trademark case, noting that "[d]istrict courts in this Circuit that have addressed this

18  issue have found that the governing law has changed, and a plaintiff is not granted the presumption

19  of irreparable harm upon a showing of likelihood of success on the merits"); *Seed Servs., Inc. v.*

20  *Winsor Grain, Inc.*, No. 1:10-CV-2185 AWI GSA, 2012 U.S. Dist. LEXIS 51779, at *14 (E.D. Cal.

21  Apr. 12, 2012) (in a trademark case, stating that, "[g]iven the overall trend of the case law, the court

22  will not assume the existence of irreparable injury due to a showing of success on the merits");

23  *Groupion, LLC v. Groupon, Inc.*, No. C 11-00870 JSW, 2011 U.S. Dist. LEXIS 136129, at *18-19

24  (N.D. Cal. Nov. 28, 2011) (in a trademark case, declining to apply presumption); *United States Polo*

25  *Ass'n v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 540 (S.D.N.Y. 2011) (concluding that "the

26  presumption of irreparable injury in trademark cases is no longer appropriate").

27  ///

28  ///

United States District Court

For the Northern District of California

1    In their papers, Defendants do not dispute that the above legal standard generally applies

2    where a party seeks a preliminary injunction but argues that the Court should apply a heightened

3    standard of review in this case because (1) iCall is asking for a mandatory injunction that would

4    disrupt the status quo and (2) issuance of the injunction would grant iCall substantially all of its

5    remedies.

6    The Court does not find Defendants' first argument persuasive.  Although the Ninth Circuit

7    has made a distinction between mandatory and prohibitory injunctions and stated that mandatory

8    injunctions are "particularly disfavored" and should not be granted "unless extreme or very serious

9    damage will result," *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879

10   (9th Cir. 2009) (also stating that mandatory injunctions should not be "issued in doubtful cases or

11   where the injury complained of is capable of compensation in damages") (internal quotation marks

12   omitted), the injunction being sought by iCall is not fairly characterized as a mandatory injunction

13   under Ninth Circuit Law.

14   In *Marlyn*, the Ninth Circuit addressed an injunction which, *inter alia*, (1) enjoined a

15   company from manufacturing and distributing a certain product and (2) required the company to

16   recall its already-distributed products.  *See id.* at 878.  The court noted that the status quo – *i.e.*, the

17   last, uncontested status which preceded the controversy – had the company distributing the product.

18   *See id.* at 879.  The Ninth Circuit then held that the part of the injunction that required the company

19   "to take the affirmative step of recalling its product . . . did not operate simply to preserve the status

20   quo, *or* to restrain [the company] from further acts of possible infringement, because it involved

21   products no longer within [the company's] possession."  *Id.* (emphasis added).  Thus, "the district

22   court's order was something more than a prohibitory preliminary injunction."  *Id.*  However,

23   restraining the company from continuing to manufacture and distribute the product was not deemed

24   mandatory.

25   In the instant case, Defendants have tried to analogize the instant case to *Marlyn*.

26   Defendants suggest that iCall's desired injunction would, in effect, require them to do a recall

27   because the injunction "would require [them] to remove all references to WiCall in the App Store or

28   on the Internet."  Opp'n at 19.  The problem for Defendants is that, in *Marlyn*, the Ninth Circuit

1   indicated that, even though an injunction that "restrain[s] [a company] from further acts of possible

2   infringement" may not simply preserve the status quo, it still is not considered a mandatory

3   injunction.  *Marlyn*, 571 F.3d at 879.

4        As for Defendants' second argument – *i.e.*, that there should be a heightened standard of

5   review because iCall's desired injunction would grant it substantially all of the relief sought and

6   could not be undone (*i.e.*, once complied with) – it is not without merit.  Notably, that standard has

7   been employed by other circuits, and the reasoning of those courts seems sound.  *See, e.g.*, *Tom*

8   *Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 35 (2d Cir. 1995) (stating that, "if a preliminary

9   injunction will make it difficult or impossible to render a meaningful remedy to a defendant who

10   prevails on the merits at trial, then the plaintiff should have to meet the higher standard of

11   substantial, or clear showing of, likelihood of success to obtain preliminary relief"); *Edmisten v.*

12   *Werholtz*, 287 Fed. Appx. 728, 731 (10th Cir. 2008) (noting that disfavored injunctions include one

13   that would provide the moving party "with substantially all the injunctive relief he seeks"); *see also*

14   *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 490 (8th Cir. 1993)

15   ("find[ing] that the district court did not clearly err in holding" that plaintiff did not meet its

16   "'heavy' burden" because plaintiff "seeks on its motion . . . substantially the same relief it would

17   obtain after a trial on the merits").  Nevertheless, the Ninth Circuit has not addressed this issue, and

18   the Court need not decide whether to apply that standard in the instant case.  This is because, even

19   under the traditional preliminary injunction test, iCall has not adequately established that it is

20   entitled to such relief.

21   B.   <u>Likelihood of Success on the Merits</u>

22        Under the traditional preliminary injunction test, the first factor is whether iCall can establish

23   a likelihood of success on the merits.  Although iCall has brought multiple claims for relief, the

24   parties basically agree that, for all or most of the claims, the critical question is whether iCall can

25   demonstrate that there is a likelihood of confusion between its mark and the "WiCall" mark.  *See,*

26   *e.g.*, *M2 Software, Inc. v. Madacy Entertainment Corp.*, 421 F.3d 1073, 1080 (9th Cir. 2005) (stating

27   that "[t]he test of trademark infringement under state, federal, and common law is whether there will

28   be a likelihood of confusion"); *Brookfield Comms., Inc. v. West Coast Entm't Corp.,* 174 F.3d 1036,

1    1047 n.8 (9th Cir. 1999) (noting that "oftentimes" the analysis under §§ 32 and 43(a) of the Lanham

2    Act, 15 U.S.C. §§ 1114, 1125(a), is "identical"); *Academy of Mot. Pic. Arts & Sci. v. Creative House*

3    *Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir. 1991) (holding that, under both federal trademark

4    infringement and state unfair competition statutes, the "ultimate test" is whether a likelihood of

5    confusion exists) (internal quotations omitted).

6        In determining whether there is a likelihood of confusion, courts in the Ninth Circuit have

7    typically applied the eight factors identified by the appellate court in *AMF, Inc. v. Sleekcraft Boats*,

8    599 F.2d 341 (9th Cir. 1979): (1) strength of the mark; (2) proximity of the goods; (3) similarity of

9    the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the

10   degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark;

11   and (8) likelihood of expansion of the product lines.  "The test is a fluid one and the plaintiff need

12   not satisfy every factor, provided that strong showings are made with respect to some of them."

13   *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005).

14       iCall contends, however, that, "in an Internet [trademark] infringement case," a plaintiff is

15   entitled to an injunction upon "proof of three factors: (1) defendant's use of a mark similar to

16   plaintiff's, (2) to market related goods and services, (3) on the Internet."  Mot. at 7.  iCall cites in

17   support *Perfumebay v. eBay*, 506 F.3d 1165 (9th Cir. 2007).

18       In *Perfumebay*, the plaintiff was a company that sold perfume on the Internet.  One of the

19   plaintiff's websites was perfumebay.com.  When the plaintiff applied for a trademark for its

20   "Perfume Bay" mark, eBay filed an opposition with the PTO.  Subsequently, the plaintiff sought a

21   declaratory judgment that its "Perfume Bay" mark did not infringe on the "eBay" mark.  The Ninth

22   Circuit stated:

23           In the internet context, "the three most important *Sleekcraft*
             factors in evaluating a likelihood of confusion are (1) the similarity of
24           the marks, (2) the relatedness of the goods and services, and (3) the
             parties' simultaneous use of the Web as a marketing channel."  "When
25           this controlling troika or internet trinity suggests confusion is likely,
             the other factors must weigh strongly against a likelihood of confusion
26           to avoid the finding of infringement."  "If the internet trinity does not
             clearly indicate a likelihood of consumer confusion, a district court
27           can conclude the infringement analysis only by balancing all the
             *Sleekcraft* factors within the unique context of each case."

28

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   *Id.* at 1173-74.

2        In *Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137 (9th Cir. 2011),

3   however, the Ninth Circuit clarified it did not intend "to forever enshrine these three factors . . . as

4   the test for trademark infringement on the Internet." *Id.* at 1148.  The court emphasized that there

5   should be "flexibiltiy over rigidity" and,

6           [d]epending on the facts of each specific case arising on the Internet,
            other factors may emerge as more illuminating on the question of
            consumer confusion.  In [a prior case] we used the "troika" factors to

7           analyze the risk of source confusion generated by similar domain
            names, but we did not wholesale adopt them in the metatag analysis.

8           Subsequent courts similarly have found the "troika" helpful to resolve
            disputes involving websites with similar names and appearances

9           [citing *Perfumebay* as one example].  The leading trademark treatise
            correctly explains that the "troika" analysis "is appropriate for domain

10          name disputes."

11

12  *Id.* at 1148.  Ultimately, the Ninth Circuit found "[t]he 'troika' . . . a particularly poor fit for the

13  question presented here." *Id.*  The question presented in *Network* was whether there was trademark

14  infringement when one company purchased certain keywords from search engine companies to

15  advertise its own product and one of the keywords was the mark owned by a competitor.[3]  *See id.* at

16  1142; *see also id.* at 1148 (stating that "[t]he potential infringement in this context arises from the

17  risk that while using [a company's] mark to search for information about its product, a consumer

18  might be confused by a results page that shows a competitor's advertisement on the same screen,

19  when that advertisement does not clearly identify the source or its product").

20  ///

21  ///

22  ///

23

24       [3]  In its reply brief, iCall now makes a *Network*-type claim – *i.e.*, iCall contends that Tribair

25  designated "iCall" as a search keyword in Apple's App Store so that consumers looking for iCall
    would discover WiCall.  *See* Supp. Carreon Decl. ¶ 6.c.  However, it is not clear that WiCall shows
    up because Tribair actually designated "iCall" as a search word or whether there is some other

26  function in the App Store search program that leads to WiCall as one of the results when "iCall" is
    typed in.  (iCall also claims that Defendants use "iCall" as a search word for the Tribair product, *see*

27  Supp. Gilbert Decl. ¶ 7.c; however, as Defendants point out, there is no claim that "Tribair" (as
    opposed to "WiCall") infringes on the "iCall" mark.)  Plaintiff presents no evidence of willful or

28  manipulative conduct by Defendants in this regard.

1    Seizing on *Network*, Defendants argue that the Internet troika test should not apply to the

2    instant case, particularly because there is no "WiCall" website.[4]  *See* Reiher Decl. ¶ 11.  Defendants

3    add that

> Tribair does not pay for advertising on Apple's iTunes App Store or
> Google's Android Market.  The only time a user will find WiCall in
> those databases is through the search function which populates results
> based on a formula controlled by Apple or Google.  On the Android
> Market, WiCall relies on searches for keywords in its full title
> "WiCall: VoIP call, wifi call" and to a lesser extent, keywords in its
> description.

8    Reiher Decl. ¶ 11.  As noted above, iCall disputes Defendants' claim that Tribair does not advertise

9    on the Internet, including on the App Store and Android market.  However, at the end of the day, the

10   Court need not decide whether the Internet troika test should apply in the case at bar.  This is

11   because, even if the test is applicable, the test still does not suggest that confusion is in fact likely.

12   At bottom, the "iCall" and "WiCall" marks are not that similar.

13        1.    <u>Internet Troika</u>

14        As noted above, the Internet troika consists of the following factors: (1) the similarity of the

15   marks, (2) the relatedness of the goods and services, and (3) the parties' simultaneous use of the

16   Web as a marketing channel.  In the case at bar, iCall and Tribair's goods and services are clearly

17   related.  *See Network*, 638 F.3d at 1150 (noting that "[t]he proximity of goods is measured by

18   whether the products are (1) complementary; (2) sold to the same class of purchasers; and (3) similar

19   in use and function").  That iCall offers products and services in addition to VoIP calling (*e.g.*, text

20   messages and video connections) and Tribair does not, *see* Reiher Decl. ¶ 6, is significant but not

21   dispositive.  The Gilbert declaration reflects that VoIP calling is a significant part of iCall's

22   business.  *See, e.g.*, Gilbert Decl. ¶¶ 4, 20 (claiming that iCall "pioneered the mobile market for

23   VoIP"; also testifying that iCall "has spent over $4,000,000 to acquire the iCall.com and the iCall

24   mark, to submit a patent application, develop and deploy the iCall software, develop and promote

25   and iCall.com website, and push to the forefront of the VoIP mobile market").  However, as

26

27   ─────────────

28        [4] Tribair, however, does have its own website.  *See* http://www.tribair.com (last visited
     October 31, 2012).

United States District Court

For the Northern District of California

1    discussed below, given the likely nature of consumer scrutiny, these differences in products are

2    material.

3           As to the use of the Web, even though Tribair may not use the Internet directly as a

4    marketing channel for WiCall, that does not detract from the fact that both companies make their

5    products and services available through Apple's App Store and/or Google's Android Market.  *But

6    see Network*, 638 F.3d at 1151 (noting that the marketing channels factor is "less important when the

7    marketing channel is less obscure"; that, "[t]oday, it would be the rare commercial retailer that did

8    not advertise online"; and that "the shared use of a ubiquitous marketing channel does not shed

9    much light on the likelihood of consumer confusion").

10          In the instant case, the most significant factor in the Internet troika is the similarity of the

11   marks.  "Similarity of the marks is tested on three levels: sight, sound, and meaning."  *Id.* at 1150.

12   Notably, "[e]ach must be considered *as they are encountered in the marketplace*."  *Id.*; *see also*

13   *Perfumebay*, 506 F.3d at 1174 (noting that "'a court does not consider the similarity of the marks in

14   the abstract, but rather in light of the way the marks are encountered in the marketplace and the

15   circumstances surrounding the purchase'"); *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d

16   497, 503 (2d Cir. 1996) (stating that "[a]n inquiry into the degree of similarity between two marks

17   does not end with a comparison of the marks themselves"; rather, "[t]he setting in which a

18   designation is used affects its appearance and colors the impression conveyed by it" – "[i]n this

19   connection, placement of the marks next to other identifying but dissimilar symbols is clearly

20   relevant") (internal quotation marks omitted).

21          In comparing the "iCall" and "WiCall" marks, the Court begins by taking into account that,

22          [w]hile the basic rule is that marks must be compared in their
             entireties and not dissected, "in articulating reasons for reaching a
23          conclusion on the issue of confusion, there is nothing improper in
             stating that, for rational reasons, more or less weight has been given to
24          a particular feature of a mark, provided the ultimate conclusion rests
             on consideration of the marks in their entireties."  Although it is not
25          proper to dissect a mark, one feature of a mark may be more
             significant and it is proper to give greater force and effect to that
26          dominant feature.  Thus, as a preliminary to comparing marks in their
             entireties, *it is not improper to discount the similarity of descriptive or*
27          *generic parts of conflicting marks.*

28

United States District Court
For the Northern District of California

11

United States District Court

For the Northern District of California

1   McCarthy on Trademarks & Unfair Competition § 23:42 (emphasis added).  *See, e.g.*, *Gruma Corp.*

2   *v. Mexican Rests., Inc.*, No. 11-41105, 2012 U.S. App. LEXIS 21141, at *9 (5th Cir. Oct. 11, 2012)

3   (noting that "the dominant word or words in a mark should be the focus of the analysis" – *e.g.*, in

4   comparing the marks "JOSE GASPAR GOLD" and "GASPAR's ALE," "[t]he word ALE . . . [is]

5   descriptive or generic with respect to the involved goods or services," with "GASPAR as the

6   dominant feature of the mark").  *But see Sleekcraft*, 599 F.2d at 351 (acknowledging that "craft" is a

7   "generic frequently used in trademarks on boats" but adding that "the common endings do add to the

8   marks' similarity").

9       Based on the above principle, the Court discounts to some degree the similarity of the word

10  "Call," which is a component in both the "iCall" and "WiCall" marks.  The word "Call" is clearly a

11  descriptive word, *i.e.*, a word used to describe the VoIP calling product and service.  The more

12  significant factor is the comparison of the "i" and "Wi," which is the dominant component.

13      In terms of sight, "i" and "Wi" are admittedly similar, differing by one letter only.

14  Nevertheless, there is an important visual difference between the two in that "WiCall" begins with a

15  capital letter and "iCall" does not.  In terms of sound, *see Sleekcraft*, 599 F.2d at 351-52 (noting that

16  sound is "important because reputation is often conveyed word-of-mouth"), there is some similarity

17  between the two marks in that both use the long "i" sound.  However, there is also an aural

18  difference that is not insignificant given that "Wi" begins with a consonant.  *Cf. W.L. Gore &*

19  *Assocs. v. Johnson & Johnson*, 882 F. Supp. 1454, 1458 (D. Del. 1995) (acknowledging that "Slide"

20  and "Glide" rhyme but noting that "[t]he sound of the first letter in the rhyming words [makes an]

21  aural difference: "'Slide' has a soft 's' sound and 'Glide' has a hard 'g' sound"); *Dahl v. Swift*

22  *Distrib., Inc.*, No. CV 10-00551 SJO (RZx), 2010 U.S. Dist. LEXIS 35938, at *23 (C.D. Cal. Apr. 1,

23  2010) (in comparing the marks "ULTI-CART" and "MULTI-CART," noting that "the two sound

24  similar, but not identical when read, given the absence of the 'M' at the beginning of Defendants'

25  product name").

26      Furthermore, there is a significant and salient difference in meaning between "i" and "Wi."

27  "i" is a word that does not appear to have any concrete meaning, although it is commonly used in

28

**United States District Court**

For the Northern District of California

conjunction with at least Apple products (*e.g.*, iPhone, iPod, iPad).[5]  *See* Def.'s RJN, Ex. H (list of Apple trademarks).  "i" could refer to the Internet, the first person pronoun, or something else.  In contrast, "Wi" clearly connotes a shorthand for "Wi-Fi," *i.e.*, a technology that allows for the wireless exchange of data.  Indeed, that is why, according to Tribair, it chose the mark.  *See also* Reiher Decl. ¶ 3 (testifying that "Tribair selected the name WiCall because it was a simple name that described what the application does:  Wi-Fi calls").

        In addition, when one considers the use of the marks *as encountered in the marketplace*, there is more to establish a lack of similarity.  *See, e.g.*, *Perfumebay*, 506 F.3d at 1175 (noting that the marks must be analyzed "in their internet usage, not simply as the terms are pronounced or viewed in the abstract").  Defendants have provided evidence that, when the "iCall" and "WiCall" marks are searched for on Apple's App Store and Google's Android Market, they always appear with their logos which are very distinct (*e.g.*, on the App Store, the WiCall logo consists of three phones while the iCall logo consists of a cube with not only a phone icon on it but also, *e.g.*, a message icon[6]).  Reiher Decl. ¶¶ 17, 19-20.  iCall has not provided any evidence that either the "iCall" or "WiCall" mark is commonly viewed with the logo being absent.  *Compare, e.g.*, *Sleekcraft*, 599 F.2d at 351 (agreeing with alleged infringer that "the names appear dissimilar when viewed in conjunction with the logo, but [noting that] the logo is often absent:  The exhibits show that the word Sleekcraft is frequently found alone in trade journals, company stationery, and various advertisements").  In its reply brief, iCall argues that the WiCall logo displayed in the Android market improperly incorporates the Wi-Fi Alliance logo, but that is beside the point.  That does not address whether or not the iCall and WiCall logos bear any similarities.

///

///

_____

[5] Admittedly, the "iCall" mark was used prior to Apple's use of "i" in its products.

[6] The three sides of the cube that are visible are in different colors – green, blue, and orange.  *See* Pl.'s Ex. 4 (iTunes Preview page for iCall); *see also* Reiher Decl. ¶ 20.  The WiCall logo does not use this variation in color.  *See* Pl.'s Ex. 11 (iTunes Preview page for WiCall); *see also* Reiher Decl. ¶ 19.  The WiCall logo used on the Android Market is even more different in appearance from the iCall logo.  *See* Pl.'s Ex. 12 (Google Play page for WiCall); Reiher Decl. ¶ 19.

2.      Other *Sleekcraft* Factors

In accordance with *Perfumebay*, because the Internet troika does not clearly indicate a likelihood of consumer confusion (assuming that the troika test is applicable), the Court must then balance all of the *Sleekcraft* factors.  *See Perfumebay*, 506 F.3d at 1173-74.  The remaining *Sleekcraft* factors are:  (1) strength of the mark; (4) evidence of actual confusion; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines.

a.      Strength of the Mark

"'The stronger a mark – meaning the more likely it is to be remembered and associated in the public mind with the mark's owner – the greater the protection it is accorded by the trademark laws.'"  *Network*, 638 F.3d at 1149; *see also Entrepreneur Media v. Smith*, 279 F.3d 1135, 1141 (9th Cir. 2002) (noting that stronger marks receive greater protection than weak ones).  The strength of a mark can be measured conceptually as well as commercially.  *See Network*, 638 F.3d at 1149.

"'A mark's conceptual strength depends largely on the obviousness of its connection to the good or service to which it refers.'"  *Id.*  Marks may be categorized on a "spectrum ranging from the ['fanciful or] 'arbitrary' to the 'generic,'" the former being the strongest mark and the latter being the weakest.  *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1211 (9th Cir. 2012). "A fanciful mark is 'a coined word or phrase, such as Kodak, invented solely to function as a trademark,'" while "[a]n arbitrary mark is a common word that is 'non-descriptive of any quality of the goods or services."  *Entrepreneur*, 279 F.3d at 1141 n.2; *see also Rearden*, 683 F.3d at 1211 (stating that "[a]n arbitrary mark 'consists of common words that have no connection with the actual product'").  A generic mark simply "'give[s] the general name of the product; [it] embrace[s] an entire class of products."  *Entrepreneur*, 279 F.3d at 1141 n.2.

In between fanciful/arbitrary marks and generic marks are suggestive marks and descriptive marks.  "A suggestive mark is one for which 'a consumer must use imagination or any type of multistage reasoning to understand the mark's significance[.]  [T]he mark does not *describe* the product's features, but *suggests* them.'"  *Id.* at 1142 (emphasis in original).  In contrast, a descriptive

**United States District Court**

For the Northern District of California

1    mark "'define[s] qualities or characteristics of a product in a straightforward way that requires no

2    exercise of the imagination to be understood.'"  *Id.*

3        In contrast to conceptual strength, "[c]ommercial strength is based on 'actual marketplace

4    recognition.'"  *Network*, 638 F.3d at 1149; *see also One Indus., LLC v. Jim O'Neal Distrib.*, 578

5    F.3d 1154, 1164 (9th Cir. 2009).  A company's efforts to promote a mark in association with its

6    services can strengthen the mark – for example, advertising expenditures can transform a suggestive

7    mark into a strong one.  *See Rearden*, 683 F.3d at 1211; *Network*, 638 F.3d at 1149.  If a company

8    has had exclusive use of a mark for a lengthy period of time, that can also strengthen the mark.  *See*

9    *American Int'l Group, Inc. v. American Int'l Bank*, 926 F.2d 829, 832 (9th Cir. 1991).  On the other

10   hand, "[w]hen similar marks permeate the marketplace, the strength of the mark decreases.  'In a

11   crowded field of similar marks, each member of the crowd is relatively weak in its ability to prevent

12   use by others in a crowd.'"  *One Indus.*, 578 F.3d at 1164.

13       In the instant case, the mark "iCall" clearly has some conceptual strength.  While the mark is

14   partially descriptive in its incorporation of the word "Call," it still is more fairly characterized as a

15   suggestive mark given that it also includes the "i."

16       In terms of commercial strength, iCall argues that its mark – although only suggestive and

17   not fanciful or arbitrary – has been strengthened as a result of (1) the public recognition it has

18   received for "producing a string of technical 'firsts,'"[7] Gilbert Decl. ¶ 9; (2) its efforts to promote the

19   mark, *see* Gilbert Decl. ¶ 20; and (3) its exclusive use of the mark for fourteen years.  *See* Mot. at

20   10.  iCall has not, however produced any survey or other direct evidence that its mark has acquired

21   secondary meaning.

22       Even if the Court were to accept iCall's claim that it has received "outsized publicity"

23   because of its string of technical firsts, Gilbert Decl. ¶ 9; *see also* Reply at 10 (taking note of iCall

24   being the New York Times app of the week), there are problems with iCall's other arguments.  First,

25   ────────────

26       [7] For example, iCall claims:  (1) it was the first company to move into the iPhone VoIP
     market "when AT&T and Apple agreed to allow VoIP providers with approved Apps to access the
27   AT&T wireless data network," Gilbert Decl. ¶ 6; (2) it was the first company "to offer free calling
     on the iPhone and iPod platform," Gilbert Decl. ¶ 7; and (3) its "iCall software was the first to
28   enable conversion of a media player, the iPod Touch, into a portable phone that allows the user to
     make long-distance calls at no cost."  Gilbert Decl. ¶ 8.

1 the record does not clearly reflect how much money iCall spent to promote its mark before the

2 public (*e.g.*, advertising).  The Gilbert declaration simply reflects that iCall spent more than $4

3 million to do a *number* of different things, including acquiring the mark, submitting a patent

4 application, and developing the iCall software.  *See* Gilbert Decl. ¶ 20 (testifying that iCall "has

5 spent over $4,000,000 to acquire the iCall.com and the iCall mark, to submit a patent application,

6 develop and deploy the iCall software, develop and promote the iCall.com website, and push to the

7 forefront of the VoIP mobile market").

8    Second, even if iCall has used the mark since the late 1990's, that does not mean that other

9 companies have not used similar marks during this time period.  Indeed, in another trademark case in

10 which iCall sought a preliminary injunction (the defendant's mark was "Reliance iCall"), Judge

11 Ware took note of documentary evidence provided by the defendant "that shows that the term iCall

12 is in widespread use for similar goods and services, such as 'iCallGlobe,' 'iCall Anywhere,' and

13 'iCall International.'"  *iCall, Inc. v. Reliance Comms. Ltd.*, No. C 10-02206 JW (Docket No. 56)

14 (Order at 18).  In its reply brief, iCall suggests that the Court cannot consider the *Reliance* opinion

15 because the case was ultimately settled, *see* Reply at 11 n.11, but that does not mean that the opinion

16 cannot be considered, at least absent the decision being vacated.

17    Furthermore, in the instant case, Defendants have provided evidence that

18    [t]here are other products and services similar to . . . iCall which
    incorporate the iCall name.  Some of those in the Internet are
19    iCallDialer (icalldialer.com), icallhere.com, icallglobal.com, iCall My
    World & iCall USA ([p]hone cards), iCall Centre (iopen.co.za), iCall
20    Prepaid . . . , iCall Manager (icallmanager.com), iCallFree
    (icallfree.com.ar), iCall.ge, icallinsurance.com, iCall Solutions
21    (icall.com.sg) and iCallServices.com.  Applications on Apple's iTunes
    and Google's Android Market include iCallDialer, iCallDialerLite, I
22    Call You, EasiCall, iCallShotgun, and Ashneh Icall.

23 Reiher Decl. ¶ 18.  Counsel for iCall asserts that only of these is actually a VoIP service, *see* Supp.

24 Carreon Decl. ¶ 5 (adding that "[t]hat company will be receiving a cease and desist letter shortly"),

25 but, even if this were true, the fact remains that all of the companies have something to do with

26 calling services generally (*i.e.*, even if not specifically VoIP calling).

27 ///

28 ///

1    It is also worth noting that the use of the prefix "i" has been popularized by Apple.  Its

2    seeming pervasiveness and evolution to a kind of cultural icon further calls into question the

3    strength of the "iCall" mark.

4    To the extent iCall's attorney has provided a declaration noting its success in enforcing the

5    "iCall" mark against some other companies, *see generally* Carreon Decl., it appears that, in all but

6    one of these instances, the alleged infringer voluntarily agreed to stop using the allegedly infringing

7    mark.  In none of the situations did a federal or state court issue a judgment that the allegedly

8    infringing mark was in fact infringing.

9            b.    <u>Evidence of Actual Confusion</u>

10   The Ninth Circuit has noted that

11          "[a] showing of actual confusion among significant numbers of
     consumers provides strong support for the likelihood of confusion."

12   However, "actual confusion is not necessary to a finding of likelihood
     of confusion under the Lanham Act."  Indeed, "[p]roving actual

13   confusion is difficult . . . and the courts have often discounted such
     evidence because it was unclear or insubstantial."

14

15   *Network*, 638 F.3d at 1151.

16   iCall has not offered any evidence of actual confusion, simply relying on the fact that actual

17   confusion is not required for a plaintiff to prevail in a trademark infringement case.  *See* Mot. at 11

18   (stating that iCall "does not seek to rely upon evidence of actual confusion").  In its reply brief, iCall

19   also argues that, because Defendants did not present any evidence of no confusion, this factor is

20   effectively neutral.  This latter contention lacks merit as iCall has the burden of showing that it is

21   entitled to preliminary injunctive relief.

22           c.    <u>Type of Goods and the Degree of Care Likely to Be Exercised by the</u>

23       <u>Purchaser</u>

24   In its motion, iCall contends that this factor weighs in its favor "because[,] as the *Goto.com*

25   and *Brookfield* opinions make[] clear virtually as a matter of law, Internet consumers choosing

26   between competing Web-offerings are likely to exercise little effort in distinguishing between the

27   products offered on two different websites."  Mot. at 11 (citing *GoTo.com, Inc. v. Walt Disney Co.*,

28   202 F.3d 1199 (9th Cir. 2000), and *Brookfield Comms., Inc. v. West Coast Entertainment Corp.*, 174

F.3d 1036 (9th Cir. 1999)).  In *GoTo*, the Ninth Circuit relied on *Brookfield* in concluding that "[n]avigating amongst web sites involves practically no effort whatsoever [just 'a single click of a mouse'], and arguments that Web users exercise a great deal of care before clicking on hyperlinks are unconvincing."  *GoTo*, 202 F.3d at 1209.

But iCall fails to take into account a more recent opinion from the Ninth Circuit which basically cast this part of *GoTo* and *Brookfield* into doubt.  More specifically, in *Network* (a 2011 decision), the Ninth Circuit pointed out that *GoTo* and *Brookfield* had been decided more than ten years earlier: "While the statement [above] may have been accurate then, we suspect that there are many contexts in which it no longer holds true."  *Network*, 638 F.3d at 1153.  The court also emphasized that "the default degree of consumer care is becoming more heightened as the novelty of the Internet evaporates and online commerce becomes more common."  *Id.* at 1152.  Ultimately, the Ninth Circuit in *Network* seemed to advocate for an approach that "look[s] beyond the medium itself [*e.g.*, the Internet] and to the nature of the particular goods and the relevant customers [instead]."  *Id.* (adding that "the degree of care analysis cannot begin and end at the marketing channel").

Focusing on these considerations here, the Court notes that the product and service at issue in the case at bar (VoIP calling) are not expensive and therefore a buyer could be expected to exercise modest care in choosing these products.  *See id.* (noting that, "when the goods are expensive, the buyer can be expected to exercise greater care in his purchases").  On the other hand, the typical customer purchasing the product and service is likely to be tech savvy to a limited extent and thus have some degree of sophistication.  This is significant because such purchases are likely to conduct some examination of the features of the competing products.  In this regard, as noted above, there is a difference between "iCall" and "WiCall."  iCall offers not only calling services but also messaging and videoconferencing services, while WiCall does not.  Indeed, this difference in features is reflected in the respective logos for iCall and Tribair.  This difference is likely to be noticed by consumers.

Furthermore, although iCall claims that "[b]oth [it] and Tribar . . . offer free and low-cost VoIP, so consumers have little incentive to scrutinize their offerings in detail," Mot. at 11, Defendants have offered some evidence that the WiCall product and service is not really free at all.

1    *See* Reiher Decl. ¶ 8 (testifying that, "[n]ew customers are given a nominal amount in free credits

2    (less than $1) so that they may try the service at no cost[,] [but] [o]nce these credits have been

3    depleted, a customer must purchase credits to continue to make calls").  Thus, some degree of

4    consumer scrutiny can be expected.

5                    d.      Defendant's Intent in Selecting the Mark

6         In its motion, iCall notes that, "[w]hen an alleged infringer knowingly adopts a mark similar

7    to another's, courts will presume an intent to deceive the public."  *Official Airline Guides v. Goss*, 6

8    F.3d 1385, 1394 (9th Cir. 1993).  While this is true, for the reasons stated above, the similarity

9    between the "iCall" and "WiCall" marks is marginal.  Moreover, as discussed above, there is

10   undisputed evidence that Defendants chose the "WiCall" mark based on the association with "Wi-

11   Fi."  *See* Reiher Decl. ¶ 3 (testifying that "Tribair selected the name WiCall because it was a simple

12   name that described what the application does: Wi-Fi calls").  That Defendants made this choice is

13   supported by the WiCall logo used on the Android Market.  More specifically, the logo includes the

14   words "WiFi" and incorporates the icon for the Wi-Fi Alliance.  *See* Reiher Decl. ¶¶ 19, 21.

15        To the extent iCall now argues that Defendants must have chosen the "WiCall" mark based

16   on its similarity to the "iCall" mark because "iCall" when used as a search term leads a consumer on

17   the App Store to the WiCall product, the Court does not agree.  As noted above, *see* note 3, it is not

18   clear that WiCall shows up because Tribair actually designated "iCall" as a search word or whether

19   there is some other function in the App Store search program that leads to WiCall as one of the

20   results when "iCall" is typed in.  iCall presents no evidence on this issue.

21                   e.      Likelihood of Expansion of the Product Lines

22        "A strong likelihood that either party may expand his business to compete with the other

23   favors a finding of infringement."  *Official Airline*, 6 F.3d at 1394.  Neither party has provided any

24   evidence as to this factor.  Moreover, "[t]he likelihood of expansion in product lines factor is

25   relatively unimportant where two companies already compete to a significant extent."  *Brookfield*,

26   174 F.3d at 1060.

27   ///

28   ///

19

f.      Summary

Based on all of the *Sleekcraft* factors, the Court concludes that iCall has failed to establish a likelihood of success on the merits.  On significant factors such as similarity of the marks and strength of the mark, there are substantial problems with iCall's position that Defendants' use of the "WiCall" mark is likely to confuse a reasonably prudent consumer in the marketplace.  *Cf. Dreamwerks Prod. Group v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir. 1998) (finding the following *Sleekcraft* factors "pivotal" in finding that there was a genuine dispute of material fact to bar summary judgment: (1) strength of the mark, (2) similarity of the marks, and (3) relatedness of the goods).  Because the Court, as discussed below, finds that the balance of hardships does not tip sharply in Plaintiff's favor, its failure to establish a likelihood of success mandates that the Court deny its motion.

C.      Balance of Equities

The next factors for the Court to consider in the traditional preliminary injunction test is the balance of equities.

1.      Injury to iCall

As noted above, iCall claims that it has suffered injury as a result of Defendants' use of the "WiCall" mark because, after spending more than $4 million "to acquire the iCall.com and the iCall mark, to submit a patent application, develop and deploy the iCall software, develop and promote the iCall.com website, and push to the forefront of the VoIP mobile market," it is "in danger of losing control over its own business reputation and the good will that have accrued to the iCall mark over the years."  Gilbert Decl. ¶ 20.

In some cases, courts have found irreparable injury to a trademark infringement plaintiff because of a loss of control over its own reputation and goodwill.  *See, e.g.*, *Seed Servs.*, 2012 U.S. Dist. LEXIS 51779, at *15 (finding irreparable injury element satisfied because, "if another person infringes the marks, that person borrows the owner's reputation, whose quality no longer no longer lies within the owner's control"); *United States Polo Ass'n*, 800 F. Supp. 2d at 541 (finding irreparable injury element satisfied because "the reputation and goodwill cultivated by [plaintiff] would be out of its hands" and that loss to reputation and goodwill could not be "quantified"; adding

1   that defendants' "product may or may not be of high quality, sold with sufficient care to customer

2   service, or convey the same branding image that has been highly cultivated by [plaintiff]").

3         Nevertheless, it could be argued that lost business goodwill is an injury that is compensable

4   by damages. *See OG Int'l, Ltd. v. Ubisoft Entm't*, No. C 11-04980 CRB, 2011 U.S. Dist. LEXIS

5   124020, at *27 (N.D. Cal. Oct. 26, 2011) (indicating that in theory lost customers and business

6   goodwill could be compensated by damages, which would weigh against a claim of irreparable

7   injury).

8         More fundamentally, iCall has failed to demonstrate real harm or hardship.  It has done little

9   more than argue that "'it is axiomatic that Defendants' misuse [of the registered marks] has caused

10   [it] to lose control over its reputation in the marketplace.'"  *ConocoPhillips Co. v. Gonzalez*, No.:

11   5:12-cv-00576-LHK, 2012 U.S. Dist. LEXIS 20972, at *7 (N.D. Cal. Feb. 17, 2012).  In

12   *ConocoPhillips*, Judge Koh held that this was not sufficient to show a likelihood of irreparable

13   injury: "To meet the 'irreparable harm' requirement, Plaintiff must do more than 'merely allege

14   imminent harm'; Plaintiff 'must demonstrate it.'"  *Id.* at *8.  She added that such a "conclusory

15   statement, *without citation to any evidence*, is insufficient to make a 'clear showing' that the

16   threatened harm is immediate and irreparable."  *Id.* (emphasis added).  Here, iCall has simply

17   offered the conclusory declaration of its CEO in support.  Furthermore, at the hearing, iCall admitted

18   that it did not have any concrete evidence of lost business or goodwill.

19         Thus, iCall has not only failed to demonstrate hardship that would tip the balance of equities

20   in its favor, it has failed to establish irreparable injury which is a prerequisite to preliminary

21   injunctive relief; it has not shown that irreparable injury is *likely*, rather than just a mere possibility.

22   Under *Winter*, on this ground alone, the request for a preliminary injunction must be denied.

23         2.   <u>Injury to Defendants</u>

24         Because iCall has not sufficiently established that it is likely to suffer irreparable injury

25   without an injunction, the Court need not examine the injury that Defendants would likely suffer if

26   an injunction were to issue.  Nevertheless, the Court does note that Defendants have made a much

27   stronger showing as to likely injury.

28

United States District Court

For the Northern District of California

1    First, as Defendants point out, in *Sardi's Restaurant Corp. v. Sardie*, 755 F.2d 719 (9th Cir.

2    1985), the Ninth Circuit took into account that the relative size of a business is relevant to the

3    potential hardship from a change in business name – *i.e.*, a "more established [business] is in a better

4    position to deal with any minor identity problems that might arise than the newer [business], which . .

5    . . might not survive at all without a rapid increase in local name recognition." *Id.* at 726.  Here,

6    there seems to be little dispute that iCall is a well-established company whereas Tribair is a

7    company of much more recent vintage, at least with respect to the "WiCall" brand.

8    Second, Defendants explain that there are more than 1,000 VoIP applications available

9    (including, *e.g.*, Skype), *see* Reiher Decl. ¶ 9, and so

10    [p]lacement on the search results of the iTunes App Store and Android
11    Market is critical to an application's success.  Being at the top of the
list when a user queries keywords like "VoIP" is an extremely
12    valuable commodity.  The highest results has a much higher chance of
being downloaded than a result five, ten or fifty slots further down.

13    Reiher ¶ 15.  Currently, WiCall has high placement on search results.  If Defendants were barred

14    from using the "WiCall" mark and had to rely on the use of another mark instead, they would be in

15    danger of losing their high placement on search results.  *But see* Reiher Decl. ¶ 15 (admitting that

16    "[n]o one really knows exactly what would happen to the ordering of results if WiCall was renamed,

17    because Apple and Google use a secret method to order search results on their iTunes App Store and

18    Android Market").

19    ### III.   CONCLUSION

20    Having taken into consideration the above, the Court concludes that iCall has not established

21    an adequate showing that it is entitled to preliminary injunctive relief.  Even if the traditional

22    preliminary injunction test is applied (*i.e.*, no heightened standard of review), iCall has not

23    established either a likelihood of success on the merits even if the Internet troika test is applied in

24    evaluating likelihood of confusion.  There is only limited similarity between the "iCall" and

25    "WiCall" marks and the strength of the iCall mark is debatable.  Moreover, the balance of equities

26    does not clearly tip in iCall's favor.  And iCall has failed to establish irreparable injury is likely

27    rather than merely possible.

28

Accordingly, iCall's motion for a preliminary injunction is **DENIED**.  The Court notes that this ruling based solely on the state of the record presented to the Court.  It offers no opinion on the likelihood of success were a different factual record developed after discovery.

This order disposes of Docket No. 28.


IT IS SO ORDERED.


Dated:  November 21, 2012

_____
EDWARD M. CHEN
United States District Judge